**IN THE UNITED STATES DISTRICT
COURT FOR THE SOUTHERN DISTRICT
OF TEXAS GALVESTON DIVISION**

| | |
|---|---|
| **KALLI SAVELL, as Personal Representative on behalf of the Estate of EZEKIEL SAVELL, and individually as the surviving mother of EZEKIEL SAVELL**<br>*Plaintiff,*<br><br>v.<br><br>**GALVESTON POLICE DEPARTMENT; CITY OF GALVESTON; OFFICER BRYAN PHAM**<br>*Defendants.* | **CIVIL ACTION NO: 3:26-cv-00060**<br><br>**JURY TRIAL DEMANDED** |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

Plaintiff KALLI SAVELL, on behalf of the estate of her deceased son, EZEKIEL SAVELL, and on behalf of herself as the surviving mother of EZEKIEL SAVELL (collectively "Plaintiffs"), by and through their attorneys, bring this action for damages and other legal and equitable relief from Defendants GALVESTON POLICE DEPARTMENT, CITY OF GALVESTON, OFFICER BRYAN PHAM (collectively "Defendants"), for violations of rights under the United States Constitution actionable under 42 U.S.C. § 1983, and any other cause(s) of action that can be inferred from the facts set forth herein.

## INTRODUCTION

1. This civil rights action arises from the March 2, 2024, police shooting death of 31-year-old Ezekiel Savell at his Galveston residence following a 911 call for help during a mental health crisis. Plaintiff, individually and on behalf of her deceased son, Ezekiel Savell, seeks redress against Defendants for the use of deadly force that unlawfully killed Mr. Savell under the color of

1

law and in violation of his rights under the Fourth and Fourteenth Amendments of the United States Constitution.

2.  Plaintiff further alleges that the totality of the circumstances demonstrates that Officer Pham's conduct leading up to and precipitating the shooting, was not objectively reasonable, including his disregard of Mr. Savell's known mental health crisis and of an agreed containment plan formed by the responding officers.

3.  In light of the Supreme Court's unanimous May 15, 2025, decision in *Barnes v. Felix*, 605 U.S. 73 (2025), which rejected the Fifth Circuit's former "moment of threat" doctrine and requires courts to evaluate all relevant facts and events leading up to a use of force, Plaintiff alleges that Defendants' conduct violated clearly established Fourth Amendment principles under the totality of the circumstances.

4.  The City of Gaveston's ("the City") unconstitutional, unlawful customs and official policies regarding the response to individuals in mental health crises and the use of deadly force, and its ratification of Officer Pham's actions after the fact, were the moving force behind Mr. Savell's injuries and his wrongful death.

5.  As a result of Defendants' unlawful actions, Mrs. Savell, individually as the mother of Mr. Savell and as the personal representative of Mr. Savell's estate, is entitled to recover damages pursuant to violations of rights under the United States Constitution, including (I) protections against deadly excessive force under the Fourth Amendment, (II) municipal liability for unlawful customs or practices that led to, authorized, and/or ratified Officer Pham's use of deadly excessive force against Mr. Savell, (III) municipal liability for facially unconstitutional policies that authorized Officer Pham's use of deadly excessive force against Mr. Savell, and for (IV) wrongful death. All causes of action are actionable under 42 U.S.C. § 1983.

**PARTIES**

6.   Kalli Savell is and has been, at all relevant times, a citizen of the United States of America. Mrs. Savell sues on behalf of herself as the wrongful death beneficiary of her son, Ezekiel Savell, and sues on behalf of Ezekiel Savell as the personal representative and administrator of the Estate of Ezekiel Savell under Texas probate law and pursuant to 42 U.S.C. §§ 1983 and 1988 and the Texas Wrongful Death and Survival Statutes.

7.   Defendant City of Galveston, Texas, is a local governing municipality entity in Galveston County, Texas, which funds and operates the Galveston Police Department and employs its officers. The City of Galveston is within the Southern District of Texas.

8.   Officer Pham is a law enforcement officer with the Galveston Police Department and is an employee of the City of Galveston. On information and belief, at all relevant times, Officer Pham acted under the color of law as a law enforcement officer on behalf of the City of Galveston. Officer Pham is sued in his individual, personal capacity for compensatory damages. Punitive damages are sought against Officer Pham through the estate's survival claim.

**JURISDICTION AND VENUE**

9.   This Court has jurisdiction over this action pursuant to (i) 28 U.S.C.A § 1331, which confers original jurisdiction upon this Court for actions arising under the laws of the United States; and (ii) 28 U.S.C. A. § 1343(a)(3) which conferred original jurisdiction upon this Court in any civil action to redress the deprivation, under the color of State law, of any right, privilege or immunity secured by the United States Constitution.

10. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the events or omissions giving rise to this cause of action took place within the Southern District of Texas.

## FACTUAL BACKGROUND

### A.  The Mental Health Crisis

11.     On the morning of March 2, 2024, Mr. Ezekiel Savell awoke to an unidentified man outside his window with a chainsaw trimming trees. For most, this would not have been an inherently disturbing sight. But, unlike most people, Mr. Savell had schizophrenia.

12.     Because of his schizophrenia, Mr. Savell's property manager, Brian Becker, had routinely taken steps to make sure that Mr. Savell was not caused distress by otherwise ordinary occurrences at his residence. One such step was that, before a service worker came to the property, Mr. Becker would notify Mr. Savell and his family in advance of the workers' arrival. This routine practice allowed Mr. Savell to live stably and harmoniously with his schizophrenia diagnosis.

13.     But on the morning of March 2, 2024, unbeknownst to both Mr. Savell and his property manager, the tree trimmer service came unannounced. On information and belief, the crew was scheduled for the following day but arrived a day early. Because the crew arrived unexpectedly, Mr. Becker had not been able to provide Mr. Savell or his family any advance notice of their presence, as he had done many times before for similar mundane service visits.

14.     Startled by unknown men working with chainsaws outside his apartment window, Mr. Savell became acutely distressed.

15.     As a result of this distress, Mr. Savell got one of his household knives and went outside onto his apartment's balcony where the tree trimmer with a chainsaw was working. On information and belief, Mr. Savell then approached that landscaper and struck him on the head with the hilt—not the blade—of the knife, resulting in a localized bruise or abrasion mere millimeters in size. On information and belief, at no point did Mr. Savell stab any person. Mr. Savell then retreated into his second-floor apartment, his only known place of safety.

16.     Mr. Becker called 911 and requested assistance for the mental health crisis Mr. Savell was experiencing. When he called, Mr. Becker informed the 911 dispatcher that Mr. Savell had a mental illness and had brandished a knife toward a landscaper who had startled him by operating a chainsaw outside his window, but had now retreated safely inside of his apartment. Critically, Mr. Becker did not describe an ongoing threat; the situation had already begun to de-escalate.

17.     Mr. Becker specifically told the dispatch operator of Mr. Savell: "He's inside his apartment" and "He is schizophrenic"

18.     Mr. Becker's tone on the call was not urgent, and underscoring the lack of urgency of a situation that had already essentially resolved itself, Mr. Becker told dispatch that the person who was injured "is across the street on the neighbor's porch. He's OK." Mr. Becker relayed that "He doesn't need medical attention," apparently based on the statement of other members of the crew and/or the victim. Dispatch informed him that EMS would be dispatched anyway as a matter of policy.

19.     After hanging up with Mr. Becker, the dispatch operator put the matter into the City's CAD system, noting that the patient was conscious and breathing.

20.     The dispatch operator coded the matter as a "priority 3" call and accurately relayed in the CAD that Mr. Savell was schizophrenic and inside his home across the street from the man who was injured.

21.     At 10:00:21 a.m., some six minutes before the first officer would arrive at the scene and more than ten minutes before Officer Pham would shoot Mr. Savell dead in front of his own apartment door, the CAD noted "ACTORIS SCHIZOPHRENIC." The mental health nature of the

call was thus explicit and known, or should have been known, by all responding officers, including Officer Pham, from the very outset.

22.     The CAD likewise made clear that Mr. Savell had retreated into his home and was not actively threatening anyone, reporting at 10:01:07 a.m. that "ACTOR WILL BE IN HIS APARTMENT."

**B. Officers Arrive to a De-Escalated Scene and Are Immediately Informed of Mr. Savell's Schizophrenia**

23.     By the time officers responded, the situation remained de-escalated, as it had been since even before Mr. Becker called 911. Mr. Savell had retreated into his home on the second floor. The landscaping crew had moved across the street. The one landscaper who sustained the minor head injury was being attended to by paramedics. No one was in danger.

24.     Officer Hendrick was the first officer to arrive on scene at approximately 10:06 a.m. (Hendrick Body-Worn Camera Footage, Dkt. 9-1, at 29:36) (hereafter "Hendrick BWC"). Within seconds of getting out of her squad car, Officer Hendrick was approached by Mr. Becker. Mr. Becker told Officer Hendrick where the apartment was located, and then, at 10:06:32 a.m., directly told her: "He's schizophrenic, so I don't know if you guys need to get mental health … ." (Hendrick BWC at 30:00). Officer Hendrick verbally acknowledged this information with "OK." *Id.* Mr. Becker continued: "I just spoke to his mom, so she said just for you guys to know he's schizophrenic." (Hendrick BWC at 30:05.) Mr. Savell's mother was already en route to the scene to assist in de-escalating the situation.

25.     After speaking with Mr. Becker, Officer Hendrick spoke to the EMS personnel on scene. At 10:07:24 a.m., EMS personnel told Officer Hendrick: "He has at least two knives on him … He said they were out here trimming the trees and the guy just started going nuts because he's got a psych history apparently. They said he retreated back into the building. They say he's on the

second floor in that apartment right there.: (Hendrick BWC at 30:52–31:10.) EMS then added: "They say he's stabbing anything that comes near him, so just be careful." *Id.*

26. Officer Bryan Pham arrived and appeared on Officer Hendrick's body-worn camera at approximately 10:07:43 a.m., just as EMS was completing that description of Mr. Savell's condition. (Hendrick BWC at 31:10.) Immediately thereafter, at 10:07:49 a.m., Officer Hendrick directly relayed to Officer Pham: "He's got at least two knives on him and he just came out and stabbed someone, so he is probably in like a manic episode." (Hendrick BWC at 31:17.)

27. By the time Officer Pham arrived at the scene, the facts that Mr. Savell was schizophrenic and had retreated into his home had been disseminated on the CAD, and thus within Officer Pham's knowledge, for about 7 minutes.

28. Officer Pham's only response to Officer Hendrick's explanation that Mr. Savell was in the midst of a psychiatric episode was: "Cool … Cool." (Hendrick BWC at 31:17.)

29. Thus, before taking any action, between the dispatch call and information relayed on scene, Officer Pham had been informed of the following: (1) Mr. Savell had a psych history, specifically schizophrenia, and was experiencing a psychiatric episode; (2) the triggering event for the incident was an unexpected service worker; and (3) Mr. Savell had retreated inside his home where he was armed only with household knives. No firearm was involved. No one remained in danger. The situation was already de-escalating. Officer Pham was told and acknowledged all of this information before climbing the stairs and instigating the fateful confrontation with Mr. Savell.

**C. The Officers Agreed to a Containment Plan, and a Fellow Officer Explicitly Urged Waiting**

30. At 10:08:17 a.m., Officers Pham and Hendrick began walking toward the alley behind the building, then briefly turned back. (Pham Body-Worn Camera Footage, Dkt. 9-2 at 0:26) (hereafter "Pham BWC"). At 10:08:33 a.m., Mr. Savell could be heard screaming from his

apartment. (Pham BWC at 0:32.) At 10:08:56 a.m., two additional officers—Officers Schirard and Bretting—arrived on scene and Officer Hendrick immediately approached them so that the officers on scene could form a coordinated plan. Hendrick told them: "Just so you know, this dude is like completely manic right now. He just came outside and stabbed some random person … He's like yelling at us, banging on that window." (Hendrick BWC at 32:24.)

31.    In response to this briefing, at 10:09:23 a.m., Officer Schirard said explicitly: "Why don't we wait on this guy for just one second, we know where he's at." (Hendrick BWC at 32:51.) Officer Schirard and Officer Bretting then went to speak with the victim across the street. Officer Hendrick responded: "I'm just going to stand right here and watch him." (Hendrick BWC at 32:59.) This exchange reflected the collectively understood plan: contain Mr. Savell in his apartment and wait for backup, for mental health support, for Mr. Savell's mother, and/or for the mental health crisis to pass.

32.    This containment plan was the sound and appropriate response. Mr. Savell had not pursued the landscapers. He had retreated to his apartment—his home and the only place he felt safe. He had no firearm, only knives, and the only exit from his apartment was a door at the top of a flight of stairs approximately ten yards from the alley exit. He could be heard yelling periodically, but he was not going anywhere. As those who knew him understood, due to his severe mental health condition, Mr. Savell virtually never left his apartment.

### D. Officer Pham Unilaterally Abandoned the Containment Plan and Provoked the Confrontation

33.    Rather than waiting in accordance with this containment plan, Officer Pham—alone, without backup, and without communicating his intentions to any other officer—chose to advance up the stairs toward Mr. Savell's apartment to confront him in his home.

8

34.    At 10:09:01 a.m., Officer Pham called out "I just saw him peak through the window" and immediately began walking down the alley. (Pham BWC at 0:59–1:05.) Without pausing, at 10:09:29 a.m., Officer Pham began climbing the stairs to Mr. Savell's apartment as Mr. Savell could be heard screaming inside. (Pham BWC at 1:28.)

35.    Officer Pham reached a position in front of Mr. Savell's door at approximately 10:09:56 a.m. (Pham BWC at 1:55.) Even leaving aside considerations of Mr. Savell's acute but transient mental health crisis, Officer Pham's decision to approach and confront a barricaded suspect alone without backup or communicating his intentions to his fellow officers was a reckless disregard of accepted police safety tactics, which protect both officer and public safety by requiring that officers should not enter or create such dangerous standoff situations with potentially armed individuals without backup unless required by an extreme exigency.

36.    At 10:10:00 a.m., from the front of the building Officer Hendrick, apparently noticing that Officer Pham had left his position, yelled out "Pham!" (Hendrick BWC at 33:28; Pham BWC at 1:58.) Officer Pham responded "yeah" but continued to stand at the door. At 10:10:24 a.m., Officer Pham radioed dispatch: "we're going to be at apartment 4," and took one more step up the stairs. (Pham BWC at 2:23.)

37.    At 10:10:34 a.m., Mr. Savell, apparently now aware of the man approaching his home up the alleyway stairs, yelled out "What the fuck are you looking at?" (Pham BWC at 2:33.) At 10:10:39 a.m., Officer Pham responded "Hey man, Galveston Police." (Pham BWC at 2:37.) At 10:10:41 a.m.—before Mr. Savell's door had opened or Mr. Savell had made any threatening move—Officer Pham raised his handgun and pointed it at the door. (Pham BWC at 2:40.) Immediately thereafter, at 10:10:43 a.m., Officer Pham ordered Mr. Savell to "Come out here, with your hands up." (Pham BWC at 2:41.)

38.     The door was still closed. Mr. Savell had not taken any step toward Officer Pham. No threat had been presented. Nevertheless, at 10:10:46 a.m.—just seconds later—Officer Pham escalated further, screaming "Come out here with YOUR HANDS UP!" while bracing to fire his pistol. (Pham BWC at 2:44.) The BWC footage shows Officer Pham in a shooting stance, weapon drawn and aimed at the apartment door, before Mr. Savell had opened it or taken any step outside.

39.     At 10:10:48 a.m.—two seconds after Officer Pham began screaming at him—Mr. Savell's door opened and Mr. Savell stepped out. (Pham BWC at 2:46.) At 10:10:49 a.m., two household knives were visible in Mr. Savell's hands on Officer Pham's BWC. (Pham BWC at 2:48.)

40.     At 10:10:50 a.m., Officer Pham—then beginning to step down the stairs—fired the first shot. (Pham BWC at 2:49.) At that moment, Mr. Savell was near the banister, approximately six feet away and four steps above Officer Pham. The shooting was over within seconds. Officer Pham fired multiple shots, killing Mr. Savell. Arriving in the alley at approximately the same time that Officer Pham opened fire, Officer Hendrick also fired her weapon toward the landing. (Hendrick BWC at 34:19).

41.     The knives in question were 6 or 7 inch filet knives of the kind used for cleaning fish, a common household item in Galveston, not weapons of a kind that from inside an apartment or even at six feet and on a staircase would ordinarily justify the use of lethal force in the absence of the dangerous confrontation Officer Pham himself had created. (*See* Hendrick BWC at 35:14: "He just had a knife not a gun?"; *id.* at 36:13: the knife is visible as Hendrick removes it from Savell's hand.)

42.     Officer Pham knew, or should have known, that Mr. Savell had schizophrenia and was experiencing a manic episode. He had been expressly told this by Officer Hendrick before

10

approaching the apartment and by CAD before he even arrived at the scene. He knew, or should have known, that the agreed and appropriate response was to contain Mr. Savell in his apartment and wait. Nothing required Officer Pham to advance up the stairs alone. The situation only re-escalated because of Officer Pham's reckless, unilateral choice to abandon the containment plan, draw his weapon, and scream commands at a person he knew to be in an acute psychiatric crisis.

43.    Under the totality of the circumstances, including all events prior to the shooting as required by *Barnes v. Felix*, 605 U.S. 73 (2025), Officer Pham's use of deadly force was not objectively reasonable. The confrontation that produced the need for force was itself created by Officer Pham's unreasonable tactical decisions.

## E. Medical Care Was Delayed After the Shooting

44.    After the shooting at 10:10:50 a.m., Officer Pham reached for his radio and announced "shots fired." (Pham BWC at 2:53–2:54.)

45.    Any threat that Mr. Savell had posed with his household knives was neutralized immediately after the shooting when he lay supine and bleeding to death. Despite his grave injuries, Mr. Savell appeared to still be alive and moving at 10:11:08. (Hendrick BWC at 34:46).

46.    The Officers then stood at the bottom of the stairs for an extended period, shouting at Mr. Savell to drop the knife, while Mr. Savell lay dying on the landing. (Pham BWC at 3:00.)

47.    Officer Hendrick asked Officer Pham "Do you think we should go up there? Do we need to go up there and check him?" and another officer confirmed he only had a knife, not a gun. (Hendrick BWC at 35:14.) Officers did not ascend the stairs and begin treating Mr. Savell until 10:12:39 a.m., approximately one minute and forty-nine seconds after the last shot was fired. EMT personnel did not begin treatment until 10:13:04 a.m. (Pham BWC at 5:00; Hendrick BWC at 36:32.) During the time that officers remained at the bottom of the stairs, Mr. Savell received no

11

medical attention despite having sustained multiple gunshot wounds and having been completely neutralized as a threat.

48.     Mr. Savell was taken to the hospital and pronounced dead at 10:43 a.m.

**CAUSES OF ACTION**

**COUNT I**
**DEADLY EXCESSIVE FORCE IN VIOLATION OF SECTION 1983 OF**
**42 U.S.C § 1983 AND THE FOURTH AMENDMENT OF THE U.S. CONSTITUTION**
**Officer Pham (in his Individual Capacity)**

49. The allegations contained in the preceding paragraphs are incorporated by reference.

50. The conduct alleged herein deprived Mr. Savell of rights and privileges secured and protected by the United States Constitution and the laws of the United States, namely the Fourth Amendment right to be free from excessive force. The conduct violated Mr. Savell's clearly established constitutional rights and was not objectively reasonable under the totality of the circumstances.

51.     Under well-established law, § 1983 excessive force claims must be analyzed under the Fourth Amendment's objective reasonableness standard. *Graham v. Connor,* 490 U.S. 386, 388 (1989). That inquiry requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Id.* at 396. The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, and that inquiry requires assessing the "totality of the circumstances." *Barnes v. Felix,* 605 U.S. 73, 80 (2025) (rejecting the Fifth Circuit's former "moment of threat" doctrine).

52.     In addition to the *Graham* framework, the Supreme Court specifically held in *Tennessee v. Garner,* 471 U.S. 1, 11 (1985), that a police officer may not use deadly force unless

12

the officer "has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." Deadly force against a person who does not pose such a threat violates the Fourth Amendment regardless of other circumstances. *Id.*

53.     As the Supreme Court unanimously held in *Barnes v. Felix,* 605 U.S. 73 (2025), a court evaluating an excessive force claim "must consider the totality of the circumstances" rather than artificially limiting its analysis to the split second before the trigger was pulled. *Id.* at 80. Accordingly, the entire sequence of events leading to the shooting is directly relevant to the constitutional analysis.

54.     Applying these well-established Supreme Court standards, Officer Pham knew (1) that the crime at issue was relatively minor and had entirely run its course (and was arguably a non-crime; (2) that Mr. Savell was not actively resisting arrest or attempting to evade arrest by flight, and had no means of flight; under the castle doctrine or at least a misunderstanding); (3) that Mr. Savell did not pose any immediate threat to officers or others as long as he was barricaded in his home armed only with common household knives; (4) that Mr. Savell was having a schizophrenic/manic episode triggered by an unexpected approach to his home; (5)  that his fellow officers had agreed to contain and wait, demonstrating the judgment of a reasonable officer in the circumstances. Nevertheless, Officer Pham advanced up the staircase alone and without backup in contravention of reasonable police tactics, drew his weapon and pointed it at a closed door; and screamed commands at gunpoint to a known psychiatric patient without waiting for mental health support, backup, or Mr. Savell's mother—all before Mr. Savell's door had opened. This conduct escalated a static and controlled situation into a lethal confrontation.

55.     Officer Pham's pre-shooting conduct was not merely negligent but was independently and constitutionally unreasonable. He abandoned an agreed containment plan and

recklessly disregarded sound tactics by advancing without backup and without any attempt at de-escalation toward a person he knew to be in an acute psychiatric crisis. These constitutionally unreasonable tactical decisions that directly created and caused the very confrontation in which Mr. Savell was killed.

56. Even after Officer Pham provoked the confrontation and at the moment Officer Pham fired, Mr. Savell, a man in psychiatric crisis holding filet knives approximately six feet away and four steps above Officer Pham on a staircase did not pose a significant threat of death or serious physical injury sufficient to justify the use of deadly force. Officer Pham had retreating options. He had cover options. He had time. He had fellow officers. He chose none of them.

57. Mr. Savell was killed as a direct result of Officer Pham's use of force, which objectively unreasonable under the totality of the circumstances.

58. Officer Pham's conduct violated Mr. Savell's clearly established constitutional right to be free from excessive force.

59. Officer Pham acted with reckless and callous indifference to Mr. Savell's Fourth Amendment rights, entitling Plaintiffs to punitive damages.

60. Plaintiffs' requests for relief are set forth below.

## COUNT II
## MUNICIPAL LIABILITY – UNCONSTITUTIONAL CUSTOM OR PRACTICE AND RATIFICATION IN VIOLATION OF 42 U.S.C § 1983
## <u>City of Galveston</u>

61.     The allegations contained in the preceding paragraphs are incorporated by reference.

62.     The conduct alleged herein deprived Plaintiff, on behalf of Mr. Savell, of rights and privileges secured and protected by the United States Constitution, namely the Fourth Amendment right to be free from excessive use of force.

63.     On information and belief, The City had a custom or practice of allowing Galveston Police Department officers to use excessive force against persons in mental health crisis who posed no immediate threat of serious physical harm, and of failing to develop or enforce protocols requiring de-escalation and the use of mental health resources before resorting to the use of deadly force in such encounters. This custom or practice was so common and well-settled within the Galveston Police Department as to constitute official municipal policy.

64. On information and belief, The City's official policymakers approved, ratified, and promulgated this custom or practice.

65.     The widespread custom or practice allowed by the City significantly increased the likelihood that Galveston Police Department officers would use excessive deadly force against persons in mental health crisis, and was the moving force behind Officer Pham's conduct when he killed Mr. Savell.

66.     Alternatively, the City is liable under a ratification theory. On information and belief, following the shooting of Mr. Savell, the City's final policymaker for law enforcement, the Chief of Police, was made aware of the specific circumstances of the shooting as described above and incorporated herein. On information and belief, the Chief of Police approved the shooting as consistent with Galveston Police Department policy, issued no discipline, and made no finding of

15

error or policy violation — thereby ratifying Officer Pham's conduct as the City's own, and chargeable to the City as municipal policy.

67.    Indeed, the effort to excuse and ratify Officer Pham's excessive use of force was so immediate and complete that the Department's Significant Event Form, a document that on information and belief is required in all officer-involved shootings, filled out the field for "Use of Force" by saying "No," as to not merely deny that the force used was unreasonable but to deny that force had been used at all.

68.    As a result, the City's custom or practice and its ratification of Officer Pham's specific conduct were the moving force behind Mr. Savell's wrongful death. Allowing Galveston Police Department officers to use excessive force against persons of color who posed no immediate threat of serious or significant harm was likewise the moving force behind Mr. Savell's wrongful death.

69.    Plaintiffs' requests for relief are set forth below.

## COUNT III
### MUNICIPAL LIABILITY – UNCONSTITUTIONAL OFFICIAL POLICIES IN VIOLATION OF SECTION 1983 OF THE CIVIL RIGHTS ACT OF 1964
### (42 U.S.C § 1983)
### <u>City of Galveston</u>

70.    The allegations contained in the preceding paragraphs are incorporated by reference.

71.    The conduct alleged herein deprived Mr. Savell of rights and privileges secured and protected by the United States Constitution, namely the Fourth Amendment right to be free from excessive use of force.

72.    The City's official policymaker in law enforcement created and promulgated the City's official deadly force applications policy, Policy 300.4 of the Galveston Police Department Policy Manual.

16

73.     Policy 300.4 authorizes officers to use deadly force when the officer reasonably believes an individual is an imminent threat of death or serious bodily injury, or has a weapon and intends to use it. While Policy 300.4 does not, on its face, affirmatively compel unconstitutional conduct, it is facially deficient because it fails to require officers to consider the totality of the circumstances as mandated by the Supreme Court in *Barnes v. Felix,* 605 U.S. 73 (2025), and *Graham v. Connor,* 490 U.S. 386 (1989).

74.     Specifically, Policy 300.4 fails to require officers to: (1) assess and account for the mental health status of the subject before employing deadly force; (2) exhaust available de-escalation measures, including waiting for mental health resources or family members, before resorting to deadly force in encounters with persons in mental health crisis; (3) evaluate whether the officer's own approach tactics unnecessarily created or exacerbated the threat justifying the use of force; or (4) consider the full context of the encounter, not merely the moment of threat, when assessing whether deadly force is permissible.

75.     The City's officers, including Officer Pham, are required and trained to follow Policy 300.4 in law enforcement operations. Defendant Pham acted in accordance with Policy 300.4 when he shot and killed Mr. Savell. Because Policy 300.4 failed to require the constitutionally mandated totality-of-circumstances analysis, it was the moving force behind the deprivation of Mr. Savell's constitutional rights.

76.     Alternatively, and additionally, the City is liable for its failure to adequately train its officers in crisis intervention techniques for encounters with individuals experiencing mental health crises. *City of Canton v. Harris,* 489 U.S. 378, 388-89 (1989). Under *Canton*, municipal liability for failure to train arises where "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of

17

the city can reasonably be said to have been deliberately indifferent." *Id.* at 390.

77.    The need for crisis intervention training for encounters with persons known to be experiencing acute psychiatric episodes is precisely this obvious: it is widely recognized that encounters between police and persons in mental health crisis are among the highest-risk situations for unnecessary use of force, and that trained crisis intervention techniques can de-escalate such situations without resort to deadly force.

78.    Adequate training would have equipped Officer Pham to wait for mental health resources, de-escalate Mr. Savell's episode, or otherwise avoid the confrontation that led to Mr. Savell's death. The City's failure to provide such adequate training was a direct and proximate cause of Mr. Savell's wrongful death.

79. Plaintiffs' requests for relief are set forth below.

**COUNT V**
**WRONGFUL DEATH IN VIOLATION OF 42 U.S.C § 1983**
**All Defendants**

80.    The allegations contained in the preceding paragraphs are incorporated by reference.

81.    Defendants' previously established violations of Mr. Savell's constitutional rights led to his death through Officer Pham's use of deadly excessive force and delay in providing necessary medical treatment.

82.    Defendants' constitutional violations were the direct and proximate cause of Mr. Savell's death.

83.    Plaintiff Kalli Savell brings this wrongful death claim pursuant to 42 U.S.C. §§ 1983 and 1988 and the Texas Wrongful Death and Survival Statutes. Plaintiff brings this action in her capacity as the personal representative of the Estate of Ezekiel Savell.

18

84.     Plaintiffs' requests for relief are set forth below.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury.

## REQUEST FOR RELIEF

Plaintiffs respectfully request judgment against Defendants as follows:

A. Declaring that the practices complained of herein are unlawful and in violation of the rights of Mr. Savell under the U.S. Const. and 42 U.S.C. § 1983;

B. Awarding all damages which Plaintiffs have sustained as a result of Defendants' conduct, including for physical injuries, medical bills, emotional distress, and anguish;

C. Pre-judgment and post-judgment interest, as provided by law;

D. Awarding Plaintiff Kalli Savell, as the representative of the Estate of Mr. Savell, damages for conscious pain and mental anguish prior to Mr. Savell's death, funeral and burial expenses, and exemplary and punitive damages through the estate's survival claim;

E. Awarding Plaintiff Kalli Savell, as the wrongful death beneficiary of Mr. Savell, damages for mental anguish, loss of companionship and society, and pecuniary loss;

F. Granting Plaintiffs reasonable and necessary attorneys' fees and expenses pursuant to 42 U.S.C. § 1988;

G. That the Court retain jurisdiction over Defendants until such time as it is satisfied that they have remedied the practices complained of and are determined to be in full compliance with the law; and

H. Awarding Plaintiffs such other and further legal and equitable relief as may be found appropriate and as the Court may deem just or equitable.

DATED: June 15, 2026

Respectfully Submitted,

*/s/ Holt M. Lackey*
Holt M. Lackey
Texas State Bar No. 24047763
hlackey@vkv.law
**Valli Kane & Vagnini LLP**
11149 Research Blvd, Suite 100
Austin, Texas 78759
Telephone: (516) 203-7180
Facsimile: (516) 706-0248

**COUNSEL FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 15, 2026, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all attorneys of record.

/s/ Holt M. Lackey
Holt M. Lackey