**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION**

| | | |
|---|---|---|
| KALLI SAVELL, as Personal Representative on behalf of the Estate of EZEKIEL SAVELL, and individually as the surviving mother of EZEKIEL SAVELL, | § § § § § § | Civil Action No. 3:26-cv-00060 |
| | § | JURY TRIAL DEMANDED |
| Plaintiff, | § § | |
| v. | § § | |
| GALVESTON POLICE DEPARTMENT; CITY OF GALVESTON; OFFICER BRYAN PHAM, | § § § § § | |
| Defendants. | § § | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
FIRST AMENDED COMPLAINT**

Plaintiff Kalli Savell, individually and as personal representative of the Estate of

Ezekiel Savell, files this Response in Opposition to Defendants' Motion to Dismiss (ECF

No. 17) and respectfully shows the Court as follows.

i

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................................iii

NATURE AND STAGE OF THE PROCEEDING ...................................................... 1

SUMMARY OF THE ARGUMENT........................................................................... 1

STANDARD OF REVIEW ......................................................................................... 3

ARGUMENT ............................................................................................................... 4

    I. The FAC States a Fourth Amendment Deadly-Force Claim Against Officer Pham........................................................................................................................ 4

        A. Officer Pham's Use of Force was Objectively Unreasonable ...................... 4

        B. Officer Pham's actions were unreasonable under the Supreme Court's *Graham* and *Barnes* factors ................................................................................. 7

        C. Officer Pham's Unreasonableness is Highlighted by the Reasonable Containment Plan of All Other Officers on Scene. ........................................... 10

        D. The video does not "blatantly contradict" the FAC, but corroborates that Pham's decisions provoked the final standoff.................................................... 15

        E. Qualified immunity cannot be resolved against the FAC's allegations at the pleadings stage. ..................................................................................................... 17

    III. The FAC States Municipal-Liability Claims Against the City. ................... 21

        A. The FAC plausibly pleads ratification.......................................................... 22

        B. The FAC plausibly pleads an unconstitutional custom............................. 23

        C. The FAC plausibly pleads that Policy 300.4 and inadequate training were the moving forces behind the deprivation. ........................................................ 24

    IV. The FAC did not Plead Failure to Render Medical Aid ............................... 26

    V. The Claims Against the Galveston Police Department. ................................. 27

    VI. In the Alternative, Leave to Amend Should Be Granted.............................. 27

CONCLUSION.......................................................................................................... 27

# TABLE OF AUTHORITIES

**Cases**

*Allen v. Hays*,
    65 F.4th 736 (5th Cir. 2023)................................................................22

*Amador v. Vasquez*,
    961 F.3d 721 (5th Cir. 2020)............................................................ 14, 18

*Arnold v. Williams*,
    979 F.3d 262 (5th Cir. 2020)..............................................................4, 17

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .............................................................................. 3

*Barnes v. Felix*,
    605 U.S. 73 (2025) ........................................................................passim

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ..........................................................................3, 24

*Bell v. Wolfish*,
    441 U.S. 520 (1979) .............................................................................. 8

*Cantrell v. City of Murphy*,
    666 F.3d 911 (5th Cir. 2012)................................................................20

*City of Canton v. Harris*,
    489 U.S. 378 (1989) ............................................................................24

*City of St. Louis v. Praprotnik*,
    485 U.S. 112 (1988) ............................................................................22

*Cole v. Carson*,
    935 F.3d 444 (5th Cir. 2019)...................................................... 14, 17, 18

*Coon v. Ledbetter,*
    780 F.2d 1158 (5th Cir.1986)...............................................................15

*County of Los Angeles v. Mendez*,
    581 U.S. 420 (2017) ........................................................................14, 19

*Darby v. Pasadena Police Department*,
  939 F.2d 311 (5th Cir. 1991)....................................................................................27

*Elder v. Holloway*,
  510 U.S. 510 (1994) ...................................................................................................4

*Elizondo v. Green*,
  671 F.3d 506 (5th Cir. 2012)....................................................................................20

*Est. of Parker v. Mississippi Dep't of Pub. Safety*,
  140 F.4th 226 (5th Cir. 2025)...................................................................................19

*Graham v. Connor*,
  490 U.S. 386 (1989) .....................................................................................7, 8, 9, 11

*Grandstaff v. City of Borger*,
  767 F.2d 161 (5th Cir. 1985)....................................................................................22

*Hainze v. Richards*,
  207 F.3d 795 (5th Cir. 2000)....................................................................................20

*Harmon v. City of Arlington*,
  16 F.4th 1159 (5th Cir. 2021)...............................................................................4, 16

*Kisela v. Hughes*,
  584 U.S. 100 (2018) .................................................................................................19

*Lytle v. Bexar County,*
  560 F.3d  (5th Cir. 2009).........................................................................................14

*Mace v. City of Palestine*,
  333 F.3d 621 (5th Cir. 2003)....................................................................................20

*Mullenix v. Luna*,
  577 U.S. 7 (2015) .....................................................................................................19

*Peña v. City of Rio Grande City*,
  879 F.3d 613 (5th Cir. 2018)....................................................................................24

*Peterson v. City of Fort Worth*,
  588 F.3d 838 (5th Cir. 2009)....................................................................................22

*Rockwell v. Brown*,
 664 F.3d 985 (5th Cir. 2011)....................................................................................20

*Santander v. Salazar*,
 133 F.4th 471 (5th Cir. 2025)........................................................................4, 17, 21

*Schaefer v. Whitted*,
 121 F. Supp. 3d 701 (W.D. Tex. 2015)..............................................................15, 19

*Schultea v. Wood*,
 47 F.3d 1427 (5th Cir. 1995).....................................................................................17

*Scott v. Harris*,
 550 U.S. 372 (2007) ...................................................................................................4

*Snyder v. Trepagnier*,
 142 F.3d 791 (5th Cir. 1998)....................................................................................22

*Tennessee v. Garner*,
 471 U.S. 1 (1985) ...............................................................................13, 14, 17, 18

*Thomas v. City of Galveston*,
 800 F. Supp. 2d 826 (S.D. Tex. 2011) ......................................................................23

*Webster v. City of Houston*,
 735 F.2d 838 (5th Cir. 1984).....................................................................................23

*Young v. City of Killeen*,
 775 F.2d 1349 (5th Cir. 1985)...................................................................................15

*Zorn v. Linton*,
 146 S. Ct. 926 (2026) ...............................................................................................21

**Other Authorities**
Texas Health & Safety Code § 573.001 ...........................................................................20

**NATURE AND STAGE OF THE PROCEEDING**

1.      This is a civil-rights action under 42 U.S.C. § 1983 arising from the March 2, 2024 shooting death of Ezekiel Savell, a 31-year-old man with schizophrenia, on the landing outside his own apartment door, minutes after a 911 call seeking help with his mental-health crisis. Plaintiff Kalli Savell, individually and as personal representative of her son's estate, filed her First Amended Complaint ("FAC") on June 15, 2026, pleading her claims with second-by-second citations to the responding officers' body-worn camera ("BWC") recordings. ECF No. 16. Defendants City of Galveston and Officer Bryan Pham moved to dismiss under Rule 12(b)(6). ECF No. 17 ("Motion" or "Mot."). Plaintiff files this response in opposition.

**SUMMARY OF THE ARGUMENT**

2.  In *Barnes v. Felix*, 605 U.S. 73 (2025), the Supreme Court overturned the Fifth Circuit's prior "moment of threat" doctrine and held that the objective reasonableness test for excessive force must look to "the totality of the circumstances" leading to the deadly confrontation. There is "no time limit" on the totality of the circumstances, and they are not limited to the final moment in which a shot is fired. The Supreme Court thus made perfectly clear that the excessive force inquiry cannot be resolved by a snapshot of the moment at which an officer uses deadly force.

3. The Motion to Dismiss is nonetheless quite literally based on a snapshot. The Motion seeks to argue that Officer Bryan Pham's decision to pull the trigger was reasonable at 10:10:49 a.m. on the morning of March 2, 2024, beginning their argument with a photograph of Ezekiel Savell in that second. But the Motion ignores the objectively

unreasonable and reckless decisions that Officer Pham had made in the previous 10 minutes since the mental health call had gone out on CAD, and in the previous 3 minutes that Officer Pham had been on the scene.

4. This case is not about the decision to pull the trigger in "the moment of danger." It is about the series of objectively unreasonable, reckless, and needlessly confrontational decisions Officer Pham made to create that moment of danger with a mentally ill but no longer threatening subject.

5. The totality of the circumstances show that Officer Pham arrived at the stabilized scene of a mental health call at which every other officer understood that the danger was long past, that the injury was minor, and that the mentally ill subject armed only with household knives was not going anywhere while the officers waited for help and for the mental health crisis to pass. As one officer articulated this reasonable consensus "Why don't we wait on this guy for just one second, we know where he's at." Id. ¶¶ 23–31.

6. After being briefed on this stabilized situation, Officer Pham simply said "Cool, Cool," and proceeded to unilaterally turn it into a deadly gunpoint assault on the home of a man he knew to have serious mental health issues. Officer Pham did this without backup or even notifying his fellow officers that he would attempt a solo tactical approach of the schizophrenic man's home. Officer Pham's actions were so rogue that Officer Hendrick yelled "Pham!" when she realized he was no longer stationed at the alleyway while she kept watch in the front yard. FAC ¶ 36.

7. Pistol drawn and aimed at Savell's door, finger on the trigger, voice at a hostile shout, Officer Pham disregarded everything that he and the other officers knew about the

2

scene and to which a reasonable officer would pay heed. He disregarded that Mr. Savell had schizophrenia, was in a mental health crisis (itself sparked by a perceived armed intruder), had not threatened anyone for more than 10 minutes, and was inside his home with no means of escape and armed only with knives. He disregarded basic police-safety standards against provoking an armed standoff with a barricaded subject without backup or coordination with fellow officers.  Officer Pham knowingly disregarded all of this to instigate a hostile, dangerous, objectively unreasonable and reckless confrontation.

8. Officer Pham's use of deadly force and Mr. Savell's unnecessary death were the direct and foreseeable result of Officer Pham's decisions to turn a relatively stable mental health situation into a violent gunpoint confrontation. In the totality of the circumstances, those decisions were objectively unreasonable, as was the use of deadly force that those decisions rendered inevitable.

## STANDARD OF REVIEW

9. To survive a Rule 12(b)(6) motion, a complaint need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court must accept all well-pleaded facts as true, view them in the light most favorable to the plaintiff, and draw all reasonable inferences in her favor. A motion to dismiss tests the sufficiency of the pleading. It is not a vehicle for resolving disputed facts or choosing between competing inferences.

10. The assertion of qualified immunity does not alter this standard. "Section 1983 claims implicating qualified immunity are subject to the same Rule 8 pleading standard set

3

forth in *Twombly* and *Iqbal* as all other claims; an assertion of qualified immunity in a defendant's answer or motion to dismiss does not subject the complaint to a heightened pleading standard." *Arnold v. Williams*, 979 F.3d 262, 267 (5th Cir. 2020). When qualified immunity is raised at the 12(b)(6) stage, it is not the plaintiff's burden to "identify the universe of statutory or decisional law" establishing that the right was clearly established. *Santander v. Salazar*, 133 F.4th 471, 478 (5th Cir. 2025) (quoting *Elder v. Holloway*, 510 U.S. 510 (1994)).  Well-pleaded facts suffice. *Id.*

11. Because the FAC cites the BWC recordings, the Court may consider them, but only under the narrow standard Defendants themselves quote: video "viewed in the light most favorable to the plaintiff" may be "adopted over the factual allegations in the complaint" only "if the video 'blatantly contradict[s]' those allegations." *Harmon v. City of Arlington*, 16 F.4th 1159, 1163 (5th Cir. 2021) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). Where video is ambiguous or susceptible of competing interpretations, the plaintiff's account controls.

12. As shown below, however, the Court need not referee the parties' competing characterizations of the final seconds of this encounter to deny the Motion. Under *Barnes*, Plaintiff's claim does not rise or fall on competing interpretations of the final seconds of the shooting. The video record of the reckless decisions that Officer Pham made in the minutes leading up to the shooting corroborates the FAC in every material respect.

## ARGUMENT

**I. The FAC States a Fourth Amendment Deadly-Force Claim Against Officer Pham.**

**A. Officer Pham's Use of Force was Objectively Unreasonable**

4

13. Based on the totality of the circumstances, Officer Pham's decision to aggressively confront Mr. Savell at gunpoint in his own home was objectively unreasonable under applicable Supreme Court precedent.

14. When Officer Pham arrived at Mr. Savell's apartment building, he knew everything a reasonable officer needed to know to resolve this call without violence.

15. Officer Pham knew that Mr. Savell was seriously mentally ill and in crisis. The CAD dispatch had announced, seven minutes before Officer Pham arrived at the scene and ten minutes before he began his fatal assault on Mr. Savell's door, that the "ACTOR IS SCHIZOPHRENIC." FAC ¶ 21. The property manager who called 911 told the first officer on scene, twice, that Mr. Savell was schizophrenic and asked whether "you guys need to get mental health." Id. ¶ 24. Officer Hendrick told Officer Pham directly that Mr. Savell was "probably in like a manic episode." Id. ¶ 26.

16. Officer Pham also knew that the scene was stabilized. The precipitating incident had been over for at least 7 minutes when Officer Pham arrived. Officer Hendrick had been present on the scene interviewing witnesses and maintaining order without incident for almost two minutes before Officer Pham arrived. Mr. Savell had lashed out once, at least ten minutes prior, with a knife against a landscaper whom he did not know would be on Savell's balcony with a chainsaw and whom Savell perceived as a threat against him. The incident had caused a wound mere millimeters in size, so minor that the landscaper initially declined medical attention. Id. ¶¶ 15, 18. The CAD dispatch had advised all of the officers from the outset that "ACTOR WILL BE IN HIS APARTMENT," and that was still the case when Officer Pham arrived seven minutes later. Id. ¶ 22. Mr. Savell had retreated

5

inside his apartment, the only place he felt safe. EMS was staged across the street. Mr. Savell's mother was *en route* to help de-escalate.

17. Given all of this information, the other officers on the scene agreed on a reasonable plan of containment. "Why don't we wait on this guy for just one second, we know where he's at." Id. ¶¶ 23–31.

18.   Officer Pham thus knew a mental health crisis precipitated by a perceived armed invader had led to an isolated incident 10 minutes before by a man who was still scared and in crisis but safely contained in his own home, armed only with knives, not actively threatening anyone, with time on the officers' side and an agreement among the officers on scene to wait out the crisis.

19. Officer Pham's response to all of this information was "Cool … Cool." FAC ¶ 28. He then proceeded to unilaterally disregard the containment plan in favor of violent confrontation.

20. Alone, without backup, without communicating his intentions to a single fellow officer, and in reckless disregard of accepted police-safety tactics, he climbed the stairs to the door of a man he knew to be in psychiatric crisis, drew and aimed his handgun at the closed door before Mr. Savell had opened it or made any threatening move, and screamed commands at the frightened and mentally ill man behind it. Id. ¶¶ 33–38.

21. Each of these choices by Pham to escalate the situation was objectively unreasonable. They converted a static, controlled scene into a gunpoint standoff in which the mentally ill man's only path out of the apartment ran through the officer's gunsights.

6

22.    *Barnes* unanimously rejected this Circuit's former "moment of threat" doctrine and held that the reasonableness of police force "requires analyzing the totality of the circumstances," including the events leading up to the shooting. 605 U.S. at 80-82. A court may not confine its review to the split seconds before the trigger is pulled. *Id.*

23. Nonetheless, Defendants' Motion is based almost entirely on moment-of-threat doctrine. It opens with a single still frame of Mr. Savell in his doorway, Mot. at 1, and asks the Court to adjudicate this case from that image alone.  That is precisely the approach the Supreme Court rejected in *Barnes*.

24. The moment-of-threat depicted in that image was proximately caused by a series of objectively unreasonable decisions Officer Pham had made to escalate a static mental health call into a deadly confrontation. Judged on the totality of the circumstances, the FAC pleads that  Officer Pham's use of deadly force was objectively unreasonable because the deadly confrontation was itself the product of his own objectively unreasonable, reckless decisions to escalate. As *Barnes* made clear, the *Graham* analysis must include evaluating "actions of the officer that allegedly created the danger necessitating deadly force." 605 U.S. at 84. In the totality of the circumstances, Officer Pham's actions were objectively unreasonable and "created the danger necessitating deadly force." *Id.*

**B. Officer Pham's actions were unreasonable under the Supreme Court's *Graham* and *Barnes* factors**

25. It is well established law that an officer may not use excessive force in affecting an arrest. *Graham v. Connor*, 490 U.S. 386, 388, 395 (1989). "[S]uch claims are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Id.*

7

26. *Graham* acknowledged that "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," but requires "careful attention to the facts and circumstances of each particular case." *Id.* at 396 (quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)."

27. While rejecting a mechanical application, the *Graham* Court set forth a number of factors that should be considered when assessing the reasonableness of an officer's use of force during an arrest. The *Graham* Court specifically identified at three pertinent "facts and circumstances" that must be considered in the analysis: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

28. In *Barnes*, a unanimous Supreme Court rejected the Fifth Circuit's "moment of threat" doctrine, under which courts asked "only whether an officer was in danger at the moment of the shooting." The Court held that the Fourth Amendment inquiry into the reasonableness of force "requires analyzing the totality of the circumstances," which "has no time limit": the events leading up to the shooting are part of the constitutional analysis, and earlier facts and circumstances "may bear on" how a reasonable officer would have understood, and should have responded to, later ones. 605 U.S. at 80–82.

29. Under *Barnes* and *Graham*, then, the issue is not limited to the snapshot of how Mr. Savell appeared at 10:10:48 a.m., as the Motion would have it, but looks instead to the totality of the circumstances that led to that moment and whether Officer Pham's course of conduct, judged as a whole and from the perspective of a reasonable officer possessing the

8

information he possessed, was objectively reasonable. *Graham v. Connor*, 490 U.S. 386, 396 (1989).

30. Measured that way, the FAC pleads unreasonableness at every step.

31. Officer Pham knew before he took even a single step toward the apartment that this was a concluded and contained mental health episode originating in a misunderstanding and with little ongoing danger or risk of flight.

32. Officer Pham knew from the CAD entries posted roughly seven minutes before his arrival that the subject was schizophrenic and would be inside his apartment. FAC ¶¶ 21–22, 27. This was still the status quo when he arrived on the scene seven minutes later. He knew from Officer Hendrick's direct briefing, delivered as he arrived, that Mr. Savell had knives and was "probably in like a manic episode." Id. ¶ 26. He knew the initial incident, a startled and defensive reaction to unannounced chainsaw work outside the window of his home by a schizophrenic man for whom such surprises would be particularly destabilizing, resulted in only a minor injury and had been entirely concluded for at least ten minutes. Id. ¶¶ 11–18. The victim of that incident was safely across the street and being attended to by EMS despite having initially declined the need for medical attention.

33. Applying the *Graham* factors to this situation, Officer Pham's decision to escalate to a dangerous and violent gunpoint standoff was unreasonable.

34. The first *Graham* factor, the "severity of the crime at issue," was not so dire as to require escalation and immediate wielding of deadly force in detaining Mr. Savell. While the Motion to Dismiss characterizes the crime as "felonious assault with a deadly

weapon" in an effort to justify Officer Pham's actions, the seriousness of the offense in the totality of the circumstances did not reasonably require urgent use of force. The incident was more than ten minutes in the past with no other violence having occurred in the interim, had resulted only in a minor injury, and had evidently occurred because a man with paranoid schizophrenia had reacted to the unexpected appearance of a chainsaw-wielding man on his balcony by concluding that he had to defend himself and his home. That perceived threat to Mr. Savell had also passed.

35. As to the second *Graham* factor, Mr. Savell did not pose any immediate threat to the safety of the officers or others while he was contained in his apartment. He was armed only with knives. He was in his own home. The CAD dispatch had told Officer Pham that the suspect would be in his apartment, and the suspect still was in his apartment some ten minutes later. There was no reasonable threat to anyone's safety until Officer Pham chose to unilaterally provoke a violent standoff.

36. Third, Mr. Savell was neither actively resisting arrest nor attempting to evade arrest by flight until Officer Pham confronted him at gunpoint. Savell was in his apartment, as the CAD had said he would be, and evidently not making any attempt to leave. He was upset and in crisis, but confined to his home with his mother *en route* to help de-escalate the situation. Savell did not make any attempt to leave or resist until Officer Pham pointed a gun at him and screamed a command for him to leave the apartment.

**C. Officer Pham's Unreasonableness is Highlighted by the Reasonable Containment Plan of All Other Officers on Scene.**

37. The *Graham* factors weigh particularly heavily against Officer Pham's reasonableness here in light of *Graham*'s holding that "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Here, we need not rely on hindsight or speculation to determine what a reasonable officer in the circumstances would have done, but instead can look to the objective evidence of what all three of the other officers on the scene chose to do in the circumstances—wait and contain rather than provoking a fatal confrontation.

38. Officer Schirard said it out loud: "Why don't we wait on this guy for just one second, we know where he's at." FAC ¶ 31. Officer Hendrick took up a fixed observation post: "I'm just going to stand right here and watch him." *Id.* Waiting cost the officers nothing and promised any number of peaceful resolutions: backup, mental-health resources, the calming presence of Mr. Savell's mother (already *en route*), or simply the passage of an acute and transient psychiatric episode. Id. ¶¶ 24, 31–32. Mr. Savell was behind a closed door at the top of a staircase with a single exit, armed with nothing that could harm anyone at a distance. Id. ¶ 32. Time was entirely on the officers' side.

39. As demonstrated throughout the BWC videos, every officer on the scene other than Officer Pham reasonably assessed that there was no exigency, no imminent threat, and no prospect of Mr. Savell either escaping or hurting anyone. There was no need to escalate to deadly force or instigate a gunpoint standoff.

40.  Officer Pham's unreasonably aggressive and reckless decision to provoke a standoff destroyed the stable plan agreed upon by the other officers on scene. Without

11

telling any other officer what he intended, he walked down the alley and climbed the stairs toward the apartment of a man he knew to be in acute psychiatric crisis. He did so without backup, a decision the FAC alleges was "a reckless disregard of accepted police safety tactics," which forbid single-officer confrontations with potentially armed, barricaded individuals absent extreme exigency precisely because such confrontations manufacture deadly standoffs that endanger officer and subject alike. FAC ¶¶ 33–35.

41. Here, there was no exigency of any kind, extreme or otherwise. When Officer Hendrick realized Officer Pham had abandoned his position, she yelled his name— "Pham!"—from the front of the building. Id. ¶ 36. This evidences that she was surprised by his unplanned and unreasonable advance on Savell's door.

42. But Officer Pham kept going. He took a position mere feet outside Mr. Savell's door and then, before the door had opened and before Mr. Savell had made any threatening move whatsoever, Officer Pham raised his handgun, aimed it at the closed door, and screamed at the man in crisis behind it: "Come out here with YOUR HANDS UP!" Id. ¶¶ 37–38.

43. Officer Pham thus commanded a man he knew to be schizophrenic, manic, and holding knives to come out of his apartment, while standing feet from the door in a shooting stance. If Mr. Savell stayed inside, he was defying police commands. If he came out, he faced an officer with a leveled weapon and a finger on the trigger.

44. A reasonable officer knows that a person in an acute psychotic or manic episode cannot be expected to process and calmly execute screamed, gunpoint commands. That is the entire premise of crisis-intervention practice, and it is why the plan on the ground was

12

to wait. Officer Pham's escalation made every outcome dangerous and made the lethal outcome likely.

45. As the FAC alleges, "[t]he confrontation that produced the need for force was itself created by Officer Pham's unreasonable tactical decisions." FAC ¶ 43.

46.   Deadly force is constitutional only where the officer "has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Garner*, 471 U.S. at 11. Officer Pham had no reason to believe that Mr. Savell posed any threat at all until Officer Pham disregarded all of the information on the stabilized scene and the collective wisdom of the other officers on the scene and chose to provoke a final gunpoint confrontation with a known paranoid schizophrenic subject rather than waiting for the contained situation to resolve itself naturally.

47. After *Barnes*, the immediacy-of-threat inquiry cannot be conducted from a freeze-frame. The reasonable officer against whom Officer Pham's conduct is measured is not one who materializes at the top of the stairs at 10:10:48 a.m., confronting a frightening image stripped of context. He is an officer who arrived at 10:07 a.m. knowing everything Officer Pham knew.

48. A reasonable officer, like the other three officers on scene, would never have been standing in that stairwell, alone without backup, weapon drawn on a closed door, screaming at a mentally ill man to come out of his home. Officer Pham was the author of this moment-of-threat, by his own unreasonable and reckless decision-making. Under the totality of the circumstances, an officer's reckless creation of the very confrontation he

13

then resolves with bullets weighs decisively against the reasonableness of the force. *Barnes*, 605 U.S. at 80–82; FAC ¶¶ 42–43, 54–56.

49.    Even at the door, moreover, Officer Pham retained alternatives that a reasonable officer would have used. The FAC alleges he "had retreating options. He had cover options. He had time. He had fellow officers. He chose none of them." FAC ¶ 56. Mr. Savell was four steps above him and roughly six feet away, on a landing, holding short filet knives—not a firearm, as the officers themselves confirmed moments later ("He just had a knife not a gun?"). Id. ¶¶ 40–41, 47. Officer Pham never warned that deadly force would be used, cf. *Garner*, 471 U.S. at 11–12 (warning required where feasible); his only commands were to come out and to drop the knives. The Fifth Circuit has recognized, including in knife cases, that officers may not shoot armed but non-attacking individuals—particularly the mentally ill—absent immediate necessity. *Amador v. Vasquez*, 961 F.3d 721, 728-30 (5th Cir. 2020); *Cole v. Carson*, 935 F.3d 444, 453-56 (5th Cir. 2019) (en banc). And *Lytle v. Bexar County* teaches that reasonableness "should frequently remain a question for the jury" where it turns on competing factual inferences. 560 F.3d 404, 413 (5th Cir. 2009).

50.    Defendants' contrary authorities do not hold otherwise. *County of Los Angeles v. Mendez*, 581 U.S. 420 (2017) rejected the Ninth Circuit's freestanding "provocation rule," under which a *separate, distinct* constitutional violation could retroactively transform an otherwise reasonable use of force into an unreasonable one. Plaintiff invokes no such rule. Her claim is that the shooting itself was unreasonable under the totality of the

14

circumstances—the analysis *Graham* has always required and *Barnes* has now expressly confirmed includes the officer's own conduct "leading up to" the shot. 605 U.S. at 80–82.

51. Nor does *Young v. City of Killeen*, 775 F.2d 1349 (5th Cir. 1985) insulate Officer Pham. *Young* held that *negligently* creating the circumstances of an otherwise justified shooting is not itself a constitutional violation. The FAC does not merely plead ordinary negligence, it alleges that Officer Pham's pre-shooting conduct was "not merely negligent but … independently and constitutionally unreasonable," a knowing, reckless abandonment of an agreed containment plan and of accepted police tactics that meets the constitutional thresholds of objective unreasonableness and recklessness. FAC ¶¶ 35, 42, 54–55. While *Young* insulates officers who are merely negligent, it does not apply and § 1983 still provides redress for "gross or reckless abuses of power" that result in deadly confrontations. *See, e.g. Schaefer v. Whitted*, 121 F. Supp. 3d 701, 713 (W.D. Tex. 2015) (distinguishing *Young* while collecting and synthesizing cases, including *Coon v. Ledbetter,* 780 F.2d 1158, 1163 (5th Cir.1986). Whether Officer Pham's conduct crossed that line is, at minimum, a question that cannot be resolved against Plaintiff on the pleadings.

### D. The video does not "blatantly contradict" the FAC, but corroborates that Pham's decisions provoked the final standoff.

52.    Because the constitutional analysis turns on the whole encounter, it bears emphasis that as to the ten minutes that matter, there is no video dispute at all. Defendants do not dispute what their own exhibits show: the CAD entries flagging schizophrenia and containment; Mr. Becker's warnings; the EMS briefing; Officer Hendrick's statement to

15

Officer Pham that Mr. Savell was likely in a manic episode; Officer Pham's "Cool … Cool"; Officer Schirard's "why don't we wait"; Officer Pham's solo advance; his weapon drawn and aimed at a closed door; and his screamed commands before the door ever opened. See Mot. ¶¶ 10–13 (reciting this same sequence). The only video "contradiction" Defendants assert concerns the final seconds—their characterization that Mr. Savell "charged" "to within a foot," Mot. ¶¶ 2, 14, versus the FAC's timestamped allegation that at the moment of the first shot he stood near the banister roughly six feet away and four steps above Officer Pham, two seconds after his door opened. FAC ¶ 40.

53.    That dispute cannot support dismissal, for two independent reasons. First, under *Barnes*, the Court need not resolve it. The claim is established by the totality of the circumstances leading up to the fatal moment, and those events are essentially undisputed. Second, even on its own terms, the *Scott*/*Harmon* exception permits a court to disregard allegations only when video "blatantly contradict[s]" them—viewed "in the light most favorable to the plaintiff." *Harmon*, 16 F.4th at 1163. A chaotic, seconds-long stairwell clip does not blatantly establish distance, speed, or intent. Defendants' supporting materials only deepen the factual disputes: their hand-selected still frame is a single image from a moving sequence, and their radio-traffic assertion that Mr. Savell "stabbed" the landscaper "in the head and back," Mot. ¶ 10, is a double-hearsay relay that the FAC specifically and plausibly contradicts. FAC ¶ 15 (hilt strike; bruise "mere millimeters in size"; "at no point did Mr. Savell stab any person").

54. Likewise, Defendants' footnoted assertion that Officer Pham never heard the containment plan, Mot. ¶ 12 n.2, does not "blatantly contradict" the FAC's allegation of a

16

collectively understood plan, FAC ¶ 31. It cannot be ascertained with certainty from the video which remarks by other officers Officer Pham heard, and even if Officer Pham missed parts of the containment plan to which every other officer on the scene adhered, that would only confirm the recklessness of a solo, uncommunicated no-backup advance that left his fellow officers shouting his name from the street. Id. ¶ 36.

### E. Qualified immunity cannot be resolved against the FAC's allegations at the pleadings stage.

55.   Qualified immunity does not support dismissal. The FAC is subject to the ordinary *Twombly/Iqbal* plausibility standard, not a heightened one, *Arnold v. Williams*, 979 F.3d 262, 267 (5th Cir. 2020), and Plaintiff bears no burden at the pleadings to "identify the universe" of decisional law clearly establishing the right, *Santander* 133 F.4th at 478.[1]

56. Taking the FAC as true, Officer Pham violated law that has been clearly established for decades. Under Tennessee *v. Garner*, 471 U.S. 1 (1985), the use of deadly force constitutes a seizure subject to the Fourth Amendment's reasonableness requirement. Deadly force is constitutionally impermissible unless "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Id.* at 11. Officers may not shoot a mentally ill individual absent such necessity. *Cole v. Carson*, 935 F.3d 444, 453–56 (5th Cir. 2019) (en banc).

---

[1] Defendants' reliance on *Schultea v. Wood*, 47 F.3d 1427 (5th Cir. 1995) (en banc), is misplaced. *Schultea* is a pre-*Iqbal/Twombly* case involving Rule 7(a). Regardless, the FAC pleaded with second-by-second citations to the video record already supplies the factual particularity *Schultea* contemplates.

57. Here, Mr. Savell presented no immediate or still present threat to escape or harm the officers (or anyone else) until Officer Pham escalated the situation to a deadly-force standoff by approaching Savell's door with his finger on the trigger screaming orders.

58. As described in depth above, *Graham* and *Barnes* have made clear that this clearly established law requires analysis of allegations in the totality of the circumstances, including allegations that the officer created the danger that necessitated the use of deadly force. *See Barnes*, 605 U.S. at 84

59. Qualified immunity presents two questions: whether the facts alleged make out a constitutional violation; and whether the right was clearly established. Taking the FAC as true the first prong is satisfied for the reasons above. As to the second, it has been clearly established since *Garner* that deadly force may be used only against a person posing an immediate, significant threat of death or serious physical injury. 471 U.S. at 11. The Fifth Circuit's *en banc* decision in *Cole* placed beyond debate that officers may not, without warning, shoot a mentally disturbed individual absent such immediate necessity. 935 F.3d at 453–56 (*see also Amador*, applying the same rule to a knife-holding subject, 961 F.3d at 728–30).

60. On the facts pleaded—a contained man in his own home, a ten-minutes-hence completed minor incident, an agreed plan to wait, no exigency, no warning before leveling the gun at the subject, and a confrontation of the officer's own reckless making—every reasonable officer would have understood that this use of deadly force was unlawful.

61. The Fifth Circuit has recently reaffirmed that the totality of the circumstances test for analyzing the reasonableness of force under *Graham* "requires analyzing the

'totality of the circumstances,' including whether officers "'allegedly created the danger necessitating deadly force.'" necessitating deadly force." *Est. of Parker v. Mississippi Dep't of Pub. Safety*, 140 F.4th 226, 241 (5th Cir. 2025) (quoting *Barnes*, 605 U.S. at 84 (in turn quoting *Mendez*, 581 U.S. at 429).

62. When analyzing a claim based on an officer's reckless creation of the danger necessitating deadly force, "it is axiomatic § 1983 provides redress only for gross or reckless abuses of power, but not for simple negligence. *See Schaefer* 121 F. Supp. 3d at 713 (collecting and synthesizing cases).

63. Officer Pham's decisions, which flew in direct contravention of accepted police tactics and the reasonable judgment of every other officer on the scene, were not merely negligent but grossly negligent, objectively unreasonable, and reckless. There was simply no threat and no danger until Officer Pham recklessly created it in contravention of the facts on the ground, sound police tactics, and the judgment of every reasonable officer on the scene.

64. Defendants' heavy reliance on *Mullenix v. Luna*, 577 U.S. 7 (2015), and *Kisela v. Hughes*, 584 U.S. 100 (2018), mistakes the posture. Those cases fault courts for defining the right at too high a level of generality on summary-judgment records in which the subject's dangerousness was undisputed. Here, the operative facts are the FAC's, which are framed with the specificity *Mullenix* requires complete with carefully time-stamped reference to the BWC.

65. Defendants cite a variety of other cases that are not only procedurally inapposite because they occurred at the summary judgment phase, but which actually support

19

Plaintiff's in that the officers' actions were held to be reasonable at summary judgment because they used precisely the time, distance, and containment alternatives that Officer Pham threw away. In *Rockwell v. Brown*, 664 F.3d 985 (5th Cir. 2011), officers spent an extended period attempting to talk the subject out of his room, only after those exhaustive and cooperative efforts failed did they breach, resulting in the fatal confrontation. *See* id. at 988-89.

66. *Elizondo v. Green*, 671 F.3d 506 (5th Cir. 2012), and *Mace v. City of Palestine*, 333 F.3d 621 (5th Cir. 2003), were similarly summary judgment cases in which officers attempted to talk armed subjects down at some length from confrontations that had not been sought out by the officers in the way that Officer Pham created the confrontation with Mr. Savell here. In *Hainze v. Richards*, 207 F.3d 795 (5th Cir. 2000), the subject advanced on an officer in the open within seconds of the officer's arrival, leaving no opportunity for containment at all.

67. None of the officers in these cases marched alone, without exigency and against an agreed plan, to scream a barricaded, mentally ill man out of his own home at gunpoint. Here, the other officers had the containment over the situation that the officers in these cases all attempted to establish before using deadly force. Officer Pham did not even try containment. He actively disrupted containment and chose confrontation.

68.    Defendants' invocations of Texas Health & Safety Code § 573.001 and *Cantrell v. City of Murphy*, 666 F.3d 911 (5th Cir. 2012), Mot. ¶¶ 20–21 are irrelevant. Whether Officer Pham had authority to take Mr. Savell into custody for an emergency mental-health detention says nothing about the *manner* in which he attempted to do so. A

statute authorizing warrantless protective custody of persons in mental-health crisis does not authorize a single officer to provoke a lethal confrontation with one. The statute is intended to be protective of persons in mental-health crisis, not to escalate and instigate armed confrontations with them.

69. To the extent Defendants suggest Plaintiff must plead her way through the case law itself, *Santander* forecloses the argument. Well-pleaded facts suffice at the Motion to Dismiss phase, and Plaintiff is not required to "identify the universe of statutory or decisional law" establishing that the right was clearly established. 133 F.4th at 478. The plaintiff's burden at the pleadings is factual plausibility, not citation-matching. 133 F.4th 471. The same is true of Defendants' citation to *Zorn v. Linton*, 146 S. Ct. 926 (2026). Nothing in that decision displaces the settled rule that, on a motion to dismiss, the qualified-immunity inquiry is conducted on the plaintiff's well-pleaded facts, not the defendant's competing narrative. If Officer Pham believes a fuller record will vindicate him, summary judgment exists for that purpose. Dismissal does not.

### III. The FAC States Municipal-Liability Claims Against the City.

70. The Monell claims are adequately pleaded. The City's deadly-force policy contains no requirement that officers account for a subject's known mental illness, attempt de-escalation, or refrain from creating the very confrontation used to justify force. The City provided no crisis-intervention training adequate to equip Officer Pham to do anything other than what he did. After the shooting, the City's policymaker approved his conduct as consistent with policy, imposed no discipline, and even recorded this incident as not having involved the use of force in its Significant Event Form. FAC ¶¶ 63–78; ECF No. 17-3.

21

**A. The FAC plausibly pleads ratification.**

71.   A municipality is liable where its final policymaker approves a subordinate's decision and the basis for it. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988); *Allen v. Hays*, 65 F.4th 736, 749 (5th Cir. 2023). In *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985), the Fifth Circuit sustained municipal liability where, after officers killed an innocent man, the police chief issued no reprimands, discharged no one, and admitted no error. A factfinder may thus infer from post-incident inaction that the conduct reflected the municipality's policy.

72.   The FAC pleads a *Grandstaff* scenario. It alleges that the Chief of Police, the City's final law-enforcement policymaker, was made aware of the specific circumstances of the shooting, approved the shooting as consistent with Galveston Police Department policy, imposed no discipline, and found no error or policy violation. FAC ¶ 66.

73. The Department's own Significant Event Form for this fatal officer-involved shooting answered the field "Use of Force" with "No." This official record thus denied not merely that the force was excessive, but that force was used at all. Id. ¶ 67; ECF No. 17-3 (Defendants' Exhibit 3). An institution whose required paperwork records a fatal police shooting as involving no use of force has, at the pleadings stage, plausibly "approved" the conduct by essentially officially declaring it a non-event.

74.   Defendants respond that the matter was referred to the Texas Rangers, Mot. ¶ 53, but that is a merits argument resting on characterizations outside the pleadings. The cases on which Defendants rely, *Peterson v. City of Fort Worth*, 588 F.3d 838 (5th Cir. 2009), and *Snyder v. Trepagnier*, 142 F.3d 791 (5th Cir. 1998), were decided on full

summary-judgment and trial records, respectively. Neither holds that a plaintiff who pleads policymaker knowledge, approval, non-discipline, and a documentary whitewash fails to state a claim. Whether the facts ultimately present the "extreme factual situation" those cases describe is a question for a developed record.

### B. The FAC plausibly pleads an unconstitutional custom.

75. A custom may be shown by a "persistent, widespread practice … so common and well-settled as to constitute a custom that fairly represents municipal policy." *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc). The FAC alleges such a custom by the City permitting officers to use excessive force against persons in mental-health crisis who pose no immediate threat, and failing to develop or enforce de-escalation and mental-health-response protocols before deadly force. FAC ¶¶ 63–65.

76. This Court's precedent recognizes that at the pleadings stage a plaintiff cannot be expected to identify by date and name the universe of prior incidents known only to the City. *Thomas v. City of Galveston*, 800 F. Supp. 2d 826, 842–45 (S.D. Tex. 2011). The FAC's allegations provide fair notice of the allegedly unconstitutional custom, supported by the facts available to Plaintiff. These suffice at the Motion to Dismiss phase, when Plaintiff has not yet had the opportunity to conduct discovery into the City's internal-affairs files, training records, and prior shooting reviews.

77. Here, the available facts corroborate the alleged custom from within the City's own records. The City's deadly-force policy omits any consideration of mental health or requirement of de-escalation. The City's records likewise show that no discipline or error

23

finding was made, and its Significant Event Form likewise exonerated Officer Pham's actions. The allegations show that, at minimum, Officer Pham's actions were not so contrary to the City's customs as to earn any rebuke. Those allegations "raise a reasonable expectation that discovery will reveal evidence" of the custom. *Twombly*, 550 U.S. at 556.

### C. The FAC plausibly pleads that Policy 300.4 and inadequate training were the moving forces behind the deprivation.

78. Count III pleads two related theories: that the City's deadly-force policy was inadequate and that the City's training of Officer Pham was inadequate. Both the inadequacy of the policy and of the training are sufficiently pleaded.

79. A facially innocuous policy supports liability where it was promulgated with deliberate indifference to the known or obvious consequence that constitutional violations would result, and a failure to train is actionable where "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers … can reasonably be said to have been deliberately indifferent." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989); *Peña v. City of Rio Grande City*, 879 F.3d 613, 624 (5th Cir. 2018).

80. Policy 300.4, the City's official deadly-force policy promulgated by its policymaker, is deficient because it fails to require officers to account for the mental-health status of the subject, to exhaust available de-escalation measures, to evaluate whether the officer's own tactics created the threat, or to consider the full context of the encounter rather than the moment of threat. FAC ¶¶ 72–75. Officers, including Officer Pham, are

24

required and trained to follow Policy 300.4, and Officer Pham acted in accordance with it. Id. ¶ 75.

81. Police encounters with persons in mental-health crisis are a recurring, predictable, and notoriously high-risk category of call. Policy 300.4's complete silence as to how a mental health crisis might impact the use of deadly force is deliberately indifferent to the obvious risk that constitutional violations could occur on these calls.

82. The City's after-the-fact determination that Officer Pham violated no policy would suggest that his actions followed Policy 300.4 when he shot Mr. Savell, at least as far as the City is concerned. *Id.* ¶¶ 66, 75. Either Officer Pham complied with the policy and its deficiencies were the moving force, or he violated it with impunity and the FAC's custom and ratification theories are proven. Rule 8 permits Plaintiff to plead these alternatives, and the City cannot obtain dismissal by choosing among them.

83. Alternatively, the City failed to train its officers in crisis intervention for encounters with persons in mental-health crisis. Id. ¶¶ 76–78. Officer Pham treated a flagged mental-health call exactly like any other armed-suspect call, responded to the fact that Mr. Savell was having a mental health episode with a dismissive "Cool … Cool," and defaulted immediately to gunpoint commands screamed at the door of a paranoid schizophrenic recluse. This strongly suggests that, at least as to Officer Pham, the department's policies and training contained no mental-health-crisis-intervention component at all.

84. This is exactly the obvious need for more or different training contemplated by *Canton*. Like Policy 300.4, Galveston's police training should have been sufficient that

25

Officer Pham's reaction to learning from CAD and his fellow officers on scene that this was a mental health crisis should have resulted in something other than saying "Cool … Cool" and charging the door solo with his voice and gun raised.

85. Defendants' request that the Court take judicial notice of Policies 300.4 and 300.8, Mot. ¶¶ 43 n.4, 50 n.5, does not advance their cause. The Court may notice the existence and text of a public policy, but the adequacy of the policy and of the City's actual training practices are fact questions that cannot be resolved by a website citation.

86. A boilerplate reference in Policy 300.8 to "periodic training" concerning "vulnerable populations" does not establish, as a matter of law on the pleadings, that Galveston officers received constitutionally adequate crisis-intervention training. *Canton* itself teaches that the existence of *some* training program does not defeat a claim that the program is deliberately indifferent to an obvious need. 489 U.S. at 390–91.

### IV. The FAC did not Plead Failure to Render Medical Aid

87. Having had the opportunity to review the BWC footage after filing the Original Complaint, Plaintiff removed the count based on failure to render medical aid from her First Amended Complaint. Although the fact section still described the almost-two-minute delay between the shooting and the provision of medical aid, Plaintiff does not rely on this for liability and does not plead it as a cause of action. To the extent that a failure to render medical aid claim is perceived by Defendants as part of the FAC, Plaintiff does not oppose that claim being dismissed from the case. Count V's wrongful-death and survival claims rest on Officer Pham's unconstitutional use of deadly force and are unaffected by the withdrawal of any medical-inattention theory.

26

## V. The Claims Against the Galveston Police Department.

88.    Plaintiff acknowledges that under *Darby v. Pasadena Police Department*, 939 F.2d 311, 313 (5th Cir. 1991), a municipal police department ordinarily lacks a jural existence separate from the city that operates it. Because the City of Galveston is itself a defendant and answers for the Department's conduct, Plaintiff does not oppose dismissal of the Galveston Police Department as a separately named defendant.

## VI. In the Alternative, Leave to Amend Should Be Granted.

89.    If the Court concludes that any claim is inadequately pleaded, Plaintiff respectfully requests leave to amend under Rule 15(a)(2), which instructs that leave be freely given when justice so requires. This case is in its earliest stage, no scheduling deadline would be affected, and amendment would not be futile, particularly as to the municipal claims, where the relevant records are in the City's exclusive possession.

## CONCLUSION

90.    For the foregoing reasons, Plaintiff respectfully requests that the Motion should be denied in its entirety, except that Plaintiff does not oppose dismissal of the Galveston Police Department as a redundant, non-jural defendant. In the alternative, Plaintiff requests leave to amend.

DATED: July 27, 2026

Respectfully submitted,

*/s/ Holt M. Lackey*
Holt M. Lackey
Texas State Bar No. 24047763
SDTX Fed No. 620493

27

hlackey@vkv.law
Valli Kane & Vagnini LLP
11149 Research Blvd, Suite 100
Austin, Texas 78759
Telephone: (516) 203-7180
Facsimile: (516) 706-0248

COUNSEL FOR PLAINTIFF

**CERTIFICATE OF SERVICE**

I hereby certify that on July 27, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all attorneys of record.

_/s/ Holt M. Lackey_
Holt M. Lackey

29